THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

WASHINGTON STATE REPUBLICAN
PARTY, BERTABELLE HUBKA, STEVE
NEIGHBORS, MARCY COLLINS,
MICHAEL YOUNG, DIANE TEBELIUS,
MIKE GASTON,

        Plaintiffs,

    and

WASHINGTON STATE DEMOCRATIC
CENTRAL COMMITTEE, PAUL
BERENDT,

        Plaintiff-Intervenors,

    and

LIBERTARIAN PARTY OF
WASHINGTON STATE, RUTH BENNETT,
J. S. MILLS,

        Plaintiff-Intervenors,

    v.

WASHINGTON STATE GRANGE,

        Defendant-Intervenor,

Case No. C05-0927-JCC

ORDER

1    and

2    STATE OF WASHINGTON, ROB
     MCKENNA, SAM REED,

3

          Defendant-Intervenors.

4

5         This matter comes before the Court on Defendant-Intervenor State of Washington's

6    ("Washington") motion for summary judgment (Dkt. No. 239), Plaintiff-Intervenor

7    Washington State Democratic Central Committee's ("Democratic Party") motion for partial

8    summary judgment (Dkt. No. 247), Defendant-Intervenor Washington State Grange's

9    ("Grange") motion for summary judgment (Dkt. No. 249), Plaintiff Washington State

10   Republican Party's ("Republican Party") motion for partial summary judgment (Dkt. No. 250),

11   Washington's motion to strike certain witnesses (Dkt. No. 287), and the parties' multiple

12   responses and replies, including those of Plaintiff-Intervenor Libertarian Party of Washington

13   State ("Libertarian Party"). Having thoroughly considered the parties' briefing and the relevant

14   record, the Court finds oral argument unnecessary and grants in part and denies in part

15   Washington's and the Grange's motions for summary judgment (Dkt. Nos. 239, 249). The

16   Court likewise grants in part and denies in part the Democratic and Republican Parties'

17   motions for partial summary judgment (Dkt. Nos. 247, 250). The Court concludes that I-872 as

18   implemented in partisan elections is constitutional because the ballot and accompanying

19   information eliminate the possibility of widespread confusion among the reasonable, well-

20   informed electorate. The Court further concludes that Washington's method of electing

21   political-party precinct committee officers is unconstitutional because it allows non–party

22   members to vote for officers of the political parties. The Court strikes the trial date and denies

23   as moot the pending motion to strike certain witnesses.

24   I.       BACKGROUND

25         From 1935 until 2003, candidates for state and local office in Washington State were

26   nominated through a "blanket primary," whereby all candidates from all parties were placed on

ORDER, C05-0927-JCC
PAGE - 2

1   a single ballot and voters could select a candidate from any party. *See Wash. State Grange v.*

2   *Wash. State Republican Party*, 552 U.S. 442, 445 (2008). The candidate who won the plurality

3   of votes within each major party became that party's nominee in the general election. *Id.* The

4   Ninth Circuit Court of Appeals, relying on the Supreme Court's landmark decision in

5   *California Democratic Party v. Jones*, 530 U.S. 567 (2000), struck down Washington's

6   blanket-primary system because that system violated the political parties' First Amendment

7   right of free association by mandating that those parties allow nonmembers to participate in

8   selecting their nominees. *Democratic Party of Wash. State v. Reed*, 343 F.3d 1198, 1207 (9th

9   Cir. 2003).

10      In 2004, Washington voters approved Initiative 872 ("I-872"), which established a new

11   primary system. *Wash. State Grange*, 552 U.S. at 446–47. Under this system, all elections for

12   "partisan office" start with a primary in which every candidate filing a "declaration of

13   candidacy" competes. *Id.* at 447. Each candidate declares his or her "party preference or

14   independent status," which is designated on the primary ballot with the candidate's name. *See*

15   *id.*; Wash. Rev. Code § 29A.24.031(3). A candidate may state a party preference for any party

16   he or she desires, even if that political party would itself prefer otherwise. *See Wash. State*

17   *Grange*, 552 U.S. at 447. Voters may select any candidate listed on the ballot, regardless of

18   party preference, and the two candidates that receive the highest votes, also regardless of party

19   preference, advance to the general election. *Id.* at 447–48; Wash. Rev. Code § 29A.52.112(2).

20   In this manner, the general election becomes a runoff between the top-two vote getters in the

21   primary.

22      On May 19, 2005, the Republican Party filed this action to have I-872 declared

23   unconstitutional and to enjoin its implementation. (Dkt. No. 1.) That same day, the Democratic

24   Party and Libertarian Party moved to intervene as plaintiffs. (Dkt. Nos. 2, 3.) The Republican

25   Party alleged that the new election scheme (1) compels it to associate with any candidate who

26   expressed a "preference" for the party, thereby diluting the party's message; (2) allows

candidates to "appropriate" the party's name without permission; (3) allows party nominees to

be determined by voters whose beliefs were antithetical to those of the party, in violation of

*Jones*, 530 U.S. at 586; and (4) impermissibly denies major parties protections that it offers to

minor parties, in violation of the Equal Protection Clause.[1] (Dkt. No. 1 at 5–7.) The

Democratic Party made identical claims. (*See* Dkt. No. 31.) The Libertarian Party made similar

First Amendment claims; additionally, it alleged that I-872 arbitrarily deprived minor parties

access to the general election ballot.[2] (*See* Dkt. No. 28.)

        The Court set an expedited briefing schedule and required that the parties stipulate to

the legal issues that would be covered in the motions. (*See* Dkt. Nos. 40, 45.) On July 15, 2005,

the Court[3] granted the political parties' motions for summary judgment. (Dkt. No. 87.) The

Court held that I-872 still served to "nominate" party candidates, despite Washington's

characterization of I-872 as a "winnowing" or a "qualifying" primary. (*Id.* at 25–26.) On the

basis of that holding, the Court concluded that I-872 was unconstitutional on two grounds:

First, like the blanket primary invalidated in *Jones*, the I-872 primary "force[d] political parties

to associate with—to have their nominees, and hence their positions, determined by—those

who, at best have refused to affiliate with the party, and, at worst, have expressly affiliated

with a rival," in violation of the freedom of association. (*Id.* at 28.) Second, the Court held that

---

[1] Prior to the enactment of I-872, minor-party candidates, unlike major-party candidates, were selected through party nominating conventions. (*See* Dkt. No. 87 at 5.) The Republican Party premised its equal-protection argument on its understanding that these provisions survived the enactment of I-872.

[2] Whereas the Republican and Democratic Party's equal-protection arguments were premised on the assumption that minor parties could still nominate their candidates through nomination conventions, the Libertarian Party's ballot-access argument was based on the reverse assumption—that I-872 did not distinguish between major and minor parties, so the only way for a candidate to advance to the general election was to be in the two highest vote getters. (*See* Dkt. No. 28.)

[3] Judge Thomas S. Zilly presided over the initial stages of this litigation.

ORDER, C05-0927-JCC
PAGE - 4

1    by "allowing *any* candidate, including those who may oppose party principles and goals, to

2    appear on the ballot with a party designation," I-872 would "foster confusion and dilute the

3    party's ability to rally support behind its candidates." (*Id.* at 30.) The Court concluded that the

4    unconstitutional provisions of I-872 could not be severed from the remaining provisions and

5    therefore struck down the initiative in its entirety. (*Id.* at 38–39.)

6        The Ninth Circuit affirmed. *Wash. State Republican Party v. Washington*, 460 F.3d

7    1108, 1125 (9th Cir. 2006). The Ninth Circuit held that a candidate's self-identification of

8    party preference necessarily created an association between the candidate and the party. *Id.* at

9    1119–20. By allowing candidates to create such an association against the party's will, I-872

10   constituted "a severe burden on political parties' associational rights" that could not be

11   justified as narrowly tailored to compelling state interests. *Id.* at 1121, 1123. Accordingly, the

12   Ninth Circuit held that I-872 was unconstitutional on its face. *Id.* at 1124.

13       The Supreme Court, however, granted certiorari and reversed on the merits. *Wash.*

14   *State Grange*, 552 U.S. at 459. The Supreme Court emphasized that the political parties'

15   challenge, as it had appeared before the lower courts, was to I-872's constitutionality on its

16   face and hence could only succeed if Plaintiffs demonstrated that "the law [was]

17   unconstitutional *in all of its applications.*" *Id.* at 449 (emphasis added); *see also id.* ("[A]

18   plaintiff can only succeed in a facial challenge by establishing that no set of circumstances

19   exists under which the Act would be valid . . . ." (quotation marks omitted)). Significantly, the

20   Supreme Court concluded that "the I-872 primary does not, by its terms, choose parties'

21   nominees. . . . Whether parties nominate their own candidates outside the state-run primary is

22   simply irrelevant. In fact, parties may now nominate candidates by whatever mechanism they

23   choose because I-872 repealed Washington's prior regulations governing party nominations."

24   *Id.* at 453. If a political party chose to nominate a candidate through outside means, that

25   nomination would not be so designated on the ballot, but "[t]he First Amendment does not give

26   political parties a right to have their nominees designated as such on the ballot." *Id.* at 453 n.7.

ORDER, C05-0927-JCC
PAGE - 5

1    The Supreme Court further determined that each of the political parties' arguments

2    relied on an assumption that voters would *misinterpret* a candidate's self-identified party

3    preference as some form of endorsement by or association with the political party. *Id.* at 454.

4    Having concluded that each of the political parties' arguments "rests on factual assumptions

5    about voter confusion," the Supreme Court held that "each fails for the same reason: In the

6    absence of evidence, we cannot assume that Washington's voters will be misled." *Id.* at 457.

7    Holding that any potential confusion "will depend in significant part on the form of the ballot,"

8    the Supreme Court explained that I-872 could be implemented in such a way as to make clear

9    that a candidate's party-preference designation does not constitute an endorsement of or

10   association with that political party. *Id.* at 455; *see also id.* at 456 ("[We must] ask whether the

11   ballot could conceivably be printed in such a way as to eliminate the possibility of widespread

12   voter confusion and with it the perceived threat to the First Amendment."); *id.* at 460 (Roberts,

13   C.J., concurring) (emphasizing the importance of the form of the ballot with respect to possible

14   voter confusion). Accordingly, the Supreme Court rejected the political parties' facial

15   challenge to I-872. *Id.* at 457–59.

16       On remand, the Ninth Circuit vacated its opinion and remanded the case back to this

17   Court with instructions to (1) "dismiss all facial associational rights claims challenging [I-

18   872]"; (2) "dismiss all equal protection claims," because I-872 repealed the regulations

19   differentiating between major and minor parties; and (3) "dismiss as waived all claims that [I-

20   872] imposes illegal qualifications for federal office, sets illegal timing for federal elections or

21   imposes discriminatory campaign finance rules because these claims were neither pled by the

22   parties nor addressed in summary judgment by the district court." *Wash. State Republican

23   Party v. Washington*, 545 F.3d 1125, 1126 (9th Cir. 2008). In contrast, the panel suggested that

24   this Court "may allow the parties to further develop the record with respect to the claims that

25   [I-872] unconstitutionally constrains access to the ballot." *Id.*

26       Thereafter, Defendants Washington and the Grange moved to dismiss this action in its

ORDER, C05-0927-JCC
PAGE - 6

1    entirety (Dkt. Nos. 133, 134), and the Republican and Democratic Parties sought leave to

2    amend their Complaints (Dkt. Nos. 137, 140). They sought to supplement the Complaints with

3    additional factual allegations to support as-applied challenges to the implementation of I-872

4    that Washington adopted after the Supreme Court's decision. (*See* Dkt. No. 137 at 8; Dkt. No.

5    140 at 2.) The Court concluded that the political parties had already alleged as-applied

6    challenges to I-872's primary scheme and that those claims remained unresolved. (Dkt. No.

7    184 at 8.) The Court determined that the political parties could submit evidence to demonstrate

8    that (1) the State's actual implementation of I-872 (including its interaction with the state's

9    campaign disclosure laws) leads to voter confusion and (2) that this resulting confusion

10   severely burdens the political parties' freedom of association. (*Id.* at 11.) The Court further

11   concluded that Plaintiffs could demonstrate that the application of I-872 to certain elected

12   offices (i.e., party precinct committee officers) specifically burdens the party's right to

13   associate. (*Id.*)

14        The political parties have amended their complaints, alleging that I-872 is

15   unconstitutional as applied in Washington because it creates voter confusion that

16   unconstitutionally infringes on their First Amendment associational freedoms. The political

17   parties also allege that Washington's implementation of the election for the parties' precinct

18   committee officers in light of I-872 violates their associational rights. Washington, the Grange,

19   and the political parties have at this crucial juncture marshaled their evidence—offering in

20   particular the form of ballot used in Washington—and they ask the Court to finally resolve this

21   long-running saga over the form of political elections in Washington.[4]

22   _____

23        [4] Washington, the Grange, and the political parties all seek summary judgment on all
     the issues presented. Although the filing of cross-motions for summary judgment does not
24   vitiate the Court's responsibility to determine whether disputed issues of material facts are
     present, *see Fair Hous. Council of Riverside Cnty. v. Riverside Two*, 249 F.3d 1132, 1136 (9th
25   Cir. 2001), the universal request for summary judgment strongly indicates that this case is ripe
     for resolution. The political parties do not dispute the manner in which Washington has
26

ORDER, C05-0927-JCC
PAGE - 7

II.   DISCUSSION

A.   **Absence of Voter Confusion**

As applied, Washington's implementation of I-872 "eliminate[s] the possibility of widespread voter confusion and with it the perceived threat to the First Amendment." *See Wash. State Grange*, 552 U.S. at 456. The Supreme Court held that the political parties' assertion that voters will misinterpret the party-preference designation is "sheer speculation" that depends on the erroneous belief that voters can be misled by party labels. *Id.* at 454. The Supreme Court elaborated that its cases "reflect a greater faith in the ability of individual voters to inform themselves about campaign issues" and that there is "no basis to presume that a *well-informed electorate* will interpret a candidate's party-preference designation to mean that the candidate is the party's chosen nominee or representative or that the party associates with or approves of the candidate." *Id.* (emphasis added).

The Supreme Court was unable to review whether I-872 in operation would confuse the reasonable, well-informed electorate because Washington had not yet developed the ballot and accompanying informational material that voters would receive during the election cycle and on Election Day. Now that Washington has deployed I-872, this Court can thoroughly evaluate it. Washington's ballot contains a prominent, unambiguous, explicit statement that a candidate's party preference does not imply a nomination, endorsement, or association with the political party. The ballot repeatedly states that candidates merely "prefer" the designated parties. Ballot inserts and the Voters' Pamphlet further explain the new system. Washington employed a widespread education campaign via various media outlets to inform voters about the new system. And Washington voters themselves, not simply their elected representatives,

---

implemented I-872; they challenge the constitutionality of that implementation. Moreover, no one has requested a jury trial. The Court concludes that the record is sufficiently developed to resolve this dispute without a bench trial.

approved I-872. These factors demonstrate to the Court that Washington's implementation of I-872 eliminates the possibility of widespread confusion among the reasonable, well-informed electorate.

Most persuasive, the ballot Washington uses to implement I-872 is uniformly consistent with the Supreme Court's conception of a constitutional ballot. The Supreme Court emphatically maintained that "whether voters will be confused by the party-preference designations will depend in significant part on the form of the ballot." *Id.* at 455; *see also id.* at 460 (Robert, C.J., concurring) ("What makes this case different . . . is the place where the candidates express their party preferences: on the ballot. And what makes the ballot 'special' is precisely the effect it has on voter impressions. . . . If the ballot is designed in such a manner that no reasonable voter would believe that the candidates listed there are nominees or members of, or otherwise associated with, the parties the candidates claimed to 'prefer,' the I-872 primary system would likely pass constitutional muster." (citations omitted)). When considering "whether the ballot could conceivably be printed in such a way as to eliminate the possibility of widespread voter confusion," the Supreme Court concluded that such a ballot "is not difficult to conceive." *Id.* at 456.

The Supreme Court explained that a constitutional ballot "could include prominent disclaimers explaining that party preference reflects only the self-designation of the candidate and not an official endorsement by the party." *Id.* at 456. The Washington ballot does precisely that. Each ballot contains the following prominent and clear explanation:

> READ: Each candidate for partisan office may state a political party that he or she prefers. A candidate's preference does not imply that the candidate is nominated or endorsed by the party, or that the party approves of or associates with that candidate.

(Dkt. No. 242 at 4.) The Washington Secretary of State requires that that this language appear on primary- and general-election ballots. Wash. Admin. Code § 434-230-015(4)(a). This clear explanation included on the ballot may alone be sufficient to withstand the political parties'

constitutional concerns about the possibility of confusion among the well-informed electorate.

But Washington does more. The Supreme Court stated that Washington could provide "explanatory materials mailed to voters along with their ballots." *Id.* at 456. Washington so complies. Voters' Pamphlets must include "an explanation that each candidate for partisan office may state a political party that he or she prefers, and that a candidate's preference does not imply that the candidate is nominated or endorsed by the party or that the party approves of or associates with that candidate. The pamphlet must also explain that a candidate can choose to not state a political party preference." Wash. Admin. Code § 434-381-200. A statement nearly identical to the ballot disclaimer also appears along with each mailed ballot for the primary and general election.[5] *Id.* § 434-250-040(1)(j)–(k) ("Washington has a new primary. You do not have to pick a party. In each race, you may vote for any candidate listed. The two candidates who receive the most votes in the August primary will advance to the November general election. Each candidate for partisan office may state a political party that he or she prefers. A candidate's preference does not imply that the candidate is nominated or endorsed by the party, or that the party approves of or associates with that candidate."). In addition to including the same information in the Voters' Pamphlet mailed to every voter in the state, many Voters' Pamphlets provide further explanation of how the new system operates. (Dkt. No. 245 at 9 ("Our new Top 2 Primary on August 19 will give you maximum choice, allowing you the independence and freedom to 'vote for the person, not the party.' . . . Our new voter-approved primary no longer nominates a finalist from each major party, but rather sends the two most popular candidates forward for each office. It's a winnowing election to narrow the field. Your candidates have listed the party they prefer, but that doesn't mean the party endorses or affiliates with them.").) The cover of the 2008 Voters' Pamphlet also included an

---

[5] Notably, approximately 90 percent of the Washington electorate votes via mail. *Wash. State Grange*, 552 U.S. at 456 n.8.

explanation of the top-two system and of the candidates' statements of personal party preference. (*Id.* at 8.)

The Supreme Court also held that "the State could decide to educate the public about the new primary ballots through advertising." *Wash. State Grange*, 552 U.S. at 456. Washington again complies. Washington conducted an extensive voter education campaign designed to explain the new election system to voters. The 2008 education campaign included, among other things, a detailed Web site and a series of public-service announcements run on television and radio stations during the primary- and general-election seasons. (Dkt. No. 246 at 8–22.) Transcripts from these advertisements reinforced the point: "A candidate's party preference doesn't mean the party endorses or approves of that candidate." (*Id.* at 20.)

Finally, the Supreme Court explained that ballots "might note preference in the form of a candidate statement that emphasizes the candidate's personal determination rather than the party's acceptance of the candidate." *Wash. State Grange*, 552 U.S. at 456. Although the ballot does not include a separate statement such as "I, John Doe, prefer the Democratic Party," the ballot explicitly states under each candidate name that the candidate "prefers" a particular party (e.g., "(Prefers Republican Party)"). (Dkt. No. 242 at 4.) The statement does not say that the political party approves of the candidate or even that the party endorses the candidate; it states only a personal preference.[6] Nor does the statement include a simple abbreviation like "D" or "R" coupled with the absence of a statement of preference. It is obvious from the ballot format that the party-preference statement is merely that—a preference—that does not imply one way or another whether the political parties endorse, approve, or affiliate with that candidate. The Supreme Court held that it was "satisfied that there are a variety of ways in which the State

---

[6] Tellingly, in the party precinct-committee-officer races where voters select a political party's representative, listed below the candidate's name is a clear statement of party affiliation, and it omits the passive parentheses (e.g., "Republican Party Candidate"). (Dkt. No. 243 at 4).

1   could implement I-872 that would eliminate any real threat of voter confusion." *Wash. State*

2   *Grange*, 552 U.S. at 456. Washington has implemented I-872 uniformly consistent with several

3   of the "ways" the Supreme Court envisioned would be consistent with the Constitution, and

4   this Court therefore concludes that I-872 complies with the Constitution.

5          The standard by which the Court must evaluate the possibility of widespread confusion

6   is from the perspective of a reasonable, well-informed electorate. *See Wash. State Grange*, 552

7   U.S. at 456. Yet the political parties offer evidence of what they contend shows actual voter

8   confusion that is both irrelevant and unpersuasive. For example, the parties offer evidence of

9   newspaper articles and other materials showing that some voters and news media speak loosely

10  about the relationship between political parties, the candidates, and the election process. (*See*

11  Dkt. No. 257 at 6–8; Dkt. No. 260 at 3–6; Dkt. No. 272 at 9.) That is, some speakers, perhaps

12  using shorthand, indicate that a candidate who lists a particular party preference on the ballot is

13  in fact that party's nominee. Washington cannot control what the newspapers print, lest it run

14  afoul of yet another provision of the First Amendment, freedom of the press. Nor can

15  Washington be held responsible for the words used by private parties that might foster some

16  negligible confusion. And to the extent that state officials have occasionally used similarly

17  loose language, those isolated incidents do not show the type of widespread voter confusion

18  the Supreme Court contemplated in its review.

19         The political parties additionally argue that not all voters read the ballot instructions or

20  the instructional material included with the ballot. That may be true, but a voter who ignores or

21  refuses to read basic ballot instructions is no longer a reasonable voter, and surely not a well-

22  informed one. The Court cannot and will not consider the constitutionality of I-872 from the

23  viewpoint of such an unreasonable, uninformed voter.

24         The Court also declines the political parties' invitation to review the possibility for

25  voter confusion under traditional trademark analysis. (*See* Dkt. No. 257 at 18–20.) Quite

26  simply, trademark law does not lie in the First Amendment associational rights implicated in

ORDER, C05-0927-JCC
PAGE - 12

1    this matter. Trademark law is designed to protect the proprietary rights of private parties from

2    improper commercial uses. This case does not involve the propriety rights of the political

3    parties or Washington's commercial use of any trademark.[7] The comparison is inapposite.

4         The political parties also argue that I-872 has harmed them because some of their

5    official nominees have not advanced past the primary election to the general election. (Dkt.

6    No. 257 at 11–14.) The Democratic Party complains, for example, that in one particular race its

7    official nominee lost the primary election because "the Democratic Party was forced by the

8    State's implementation of the Top Two [system] to have three other 'Democratic candidates'

9    on the [primary] ballot" alongside the Democratic Party's chosen nominee. (Dkt. No. 257 at

10   13.) The argument misses the point: "Whether parties nominate their own candidates outside

11   the state-run primary is simply irrelevant. In fact, parties may now nominate candidates by

12   whatever mechanism they choose because I-872 repealed Washington's prior regulations

13   governing party nominations." *Wash. State Grange*, 552 U.S. at 453. The primary ballot did

14   not include "three other Democratic candidates." It included four candidates who stated a

15   preference for the Democratic Party, one of whom the Democratic Party officially endorsed.

16   "The First Amendment does not give political parties a right to have their nominees designated

17   as such on the ballot," *id.* at 453 n.7, and the political parties are not entitled as a matter of law

18   to have their nominated candidates appear on the general-election ballot. I-872 did not prevent

19   the Democratic Party's nominee from advancing to the general election; the voters did. The

20   political parties may not admire Washington's new election system in which their designated

21   candidates do not always advance to the general election, but that disappointment does not

22   raise constitutional concerns.

23   _____

24        [7] Although it does not wholly resolve the matter, the Court previously concluded that,
     as presented, "the State's expression of candidates' party preference on the ballot and in the
25   voter pamphlets may not form the basis of a federal or state trademark violation." (Dkt. No.
     184 at 17.)
26

ORDER, C05-0927-JCC
PAGE - 13

1    The political parties also offer as evidence a study purporting to show that voters

2    presented with the new ballots were confused about candidates' political-party association, or

3    lack thereof. (Dkt. No. 265-1 at 10–48.) It is not entirely clear whether the Court should

4    consider such a study—particularly given the study's limited parameters that did not include

5    all of the educational information provided to voters—when the Court is presented with a legal

6    question of whether the implementation of I-872 would create the possibility for widespread

7    confusion among a reasonable, well-informed electorate. *See Wash. State Grange*, 552 U.S. at

8    461–62 (Roberts, C.J., concurring) ("Nothing in my analysis requires the parties to produce

9    studies regarding voter perceptions on this score, but I would wait to see what the ballot says

10   before deciding whether it is unconstitutional."). For example, the federal courts consider in

11   their Establishment Clause jurisprudence whether a reasonable observer—mindful of the

12   history, purpose, and context of a government monument or practice—would perceive a

13   government endorsement of religion without resort to social or cognitive experiments. *See,*

14   *e.g.*, *Van Orden v. Perry*, 545 U.S. 677 (2005); *Barnes-Wallace v. City of San Diego*, 607 F.3d

15   1167, 1175 (9th Cir. 2010) ("The United States Supreme Court adopts the perspective of a

16   reasonable observer when determining Establishment Clause questions."). The Court sees no

17   reason why a different approach should apply here.

18       It seems particularly unwise to resort to these experiments in this context because a

19   battle of experts would likely emerge revealing no clear answer from competing social

20   experiments. Furthermore, the political parties have not shown how widespread voter

21   confusion among a reasonable, well-informed electorate may be systematically and reliably

22   measured or what its measured results may require. For example, what is the constitutional

23   result if studies show that voters in one particular county fully understand the top-two system

24   while voters in another county do not? What is the constitutional result if government officials

25   in a county that purportedly does not understand the electoral system embark on an aggressive

26   educational campaign immediately thereafter? Must the county then affirmatively show the

1    federal courts through a subsequent study that its citizens are wise enough to join their

2    neighbors who use the top-two system? How would varying county standards apply to

3    statewide offices? These questions remain unanswered. Social science experiments and studies

4    are exceptional tools for improved understanding of society, and the Court does not intend to

5    diminish their general value. But their applicability to the nuances of constitutional review in a

6    case such as this do not, as of yet, appear particularly practical.[8]

7            In any event, the political parties have not shown under the offered study that

8    Washington's implementation of I-872 has created the possibility of widespread voter

9    confusion among a reasonable, well-informed electorate. The study is neither limited to

10   Washington voters nor inclusive of the entire state's electorate. The "new voters" the study

11   evaluated were students at one university, which likely included residents from outside

12   Washington. (*See* Dkt. No. 265 at 3.) The study does not establish what percentage of

13   participants tested are likely to vote in an election. The study drew its "active voters" from e-

14   mails provided by the Republican and Democratic Parties. (*Id.*) And the Court is unaware if

15   representatives from all Washington counties participated.

16           Nowhere does the study evaluate whether the selected individuals represent the

17   _____

18       [8] The Court need not rely on Washington's expert to conclude that the presence of

19   general confusion about matters of politics and elections is common. (*See* Dkt. No. 279 at 8.) If
     any political party—or voter for that matter—must only show the presence of some confusion

20   in order to successfully challenge the constitutionality of an electoral system, then any method
     of conducting partisan elections would be vulnerable to constitutional attack. *See Storer v.*

21   *Brown*, 415 U.S. 724, 730 (1974) ("[T]here must be a substantial regulation of elections if they
     are to be fair and honest and if some sort of order, rather than chaos, is to accompany the

22   democratic process."). In a state whose population is fast approaching seven million residents,
     the political parties are bound to find voters who are confused about the electoral process. But

23   the political parties have not shown that Washington's implementation of I-872, as opposed to
     a basic misunderstanding of the electoral system, creates any widespread confusion. And with

24   each passing election, the number of uninformed voters should gradually decline. Moreover, it
     is unreasonable to conclude that Washington citizens may never change their electoral system

25   simply because some voters have grown accustomed to and understand the current system.

26

ORDER, C05-0927-JCC
PAGE - 15

1  reasonable, well-informed voter from Washington. To the point, the study did not provide its

2  participants with the explanatory materials mailed to voters along with their ballots, and the

3  study makes no reference to whether its participants were exposed to Washington's education

4  campaign conducted through various media outlets. Moreover, the study participants did not

5  receive a ballot consistent with the one Washington actually uses. Washington administrative

6  code requires that the important disclaimer regarding the lack of party association appear

7  "immediately *above* the first partisan congressional, state or county office." Wash. Admin.

8  Code § 434-230-015(4)(a) (emphasis added). Yet the ballots used in the study placed the notice

9  on the bottom-left corner, *below* the first partisan race. (Dkt. No. 265-1 at 32–33.) Moreover,

10  Washington law requires that the notice say, "READ." Wash. Admin. Code § 434-230-

11  015(4)(a). But the notice in the study said, "VOTERS-PLEASE READ," which participants

12  may have interpreted as a passive request rather than a mandatory instruction. The Court does

13  not know how those changes may have affected the study's results, and the Court is

14  unconvinced that the study accurately reflects the well-informed electorate—an electorate in

15  whom the Supreme Court has noticeable confidence.[9] *See Wash. State Grange*, 552 U.S. at 455

16  ("Our cases reflect a greater faith in the ability of individual voters to inform themselves about

17  campaign issues.").

18      Finally, the Court rejects the contention that Washington's financial disclosure laws

19  create the possibility for widespread confusion among the reasonable, well-informed

20  electorate. Washington law requires that "[f]or partisan office, if a candidate has expressed a

21  party or independent preference on the declaration of candidacy, that party or independent

22  designation shall be clearly identified in electioneering communications, independent

23

24  ───────────────

25      [9] The Court applies the same principles to the political parties' reliance on the "Elway
    Research," which did not present to its participants the ballot Washington implemented. (*See*

26  Dkt. No. 260 at 6.)

ORDER, C05-0927-JCC
PAGE - 16

1    expenditures, or political advertising." Wash. Rev. Code § 42.17.510(1). As the Public

2    Disclosure Commission details, the law requires that a candidate disclose his or her stated

3    party *preference*: "All forms of advertising must clearly state a candidate's party preference if

4    the candidate is seeking partisan office."[10] *See* Public Disclosure Commission's 2008 "Political

5    Advertising" Brochure, http://www.pdc.wa.gov/archive/guide/brochures/pdf/2008/

6    2008.Bro.Adv.pdf. Under the Court's freedom-of-association analysis, these disclosure

7    requirements, which speak of a candidate's party "preference," do not create the type of voter

8    confusion that would result in an unconstitutional burden on the political parties' First

9    Amendment rights.[11]

10          Accordingly, the Court concludes that Washington's implementation of I-872 does not

11   create the possibility of widespread confusion among the reasonable, well-informed electorate.

12

13   ───────────────────

14        [10] The political parties contend that the Public Disclosure Commission confuses voters
     by occasionally referring to political "affiliation." (*See* Dkt. No. 260 at 16.) But the
15   Commission's rules make clear that any reference to "affiliation" means merely the candidate's
     stated party preference. Wash. Admin. Code § 390-05-274 ("'Party affiliation' as that term is
16   used in chapter 42.17 RCW and Title 390 WAC means the candidate's party preference as
     expressed on his or her declaration of candidacy. A candidate's preference does not imply that
17   the candidate is nominated or endorsed by that party, or that the party approves of or associates
     with that candidate. . . . A reference to 'political party affiliation,' 'political party,' or 'party'
18   on disclosure forms adopted by the commission and in Title 390 WAC refers to the candidate's
     self-identified party preference.").
19

20        [11] The Court also rejects the Republican Party's one-paragraph contention that
     Washington's campaign-finance laws unconstitutionally interfere with its ability to
21   communicate with its members. (*See* Dkt. No. 260 at 19–20.) The Republican Party alleges
     that because political parties nominate candidates outside the state's primary system,
22   Washington's campaign-finance laws no longer serve a compelling governmental interest. (*See
     id.*) But the elimination of the state-funded nomination process neither eliminated the
23   pervasiveness of money in politics nor the government's paramount interest in curtailing
     corruption or the appearance of corruption of elected officials. Moreover, the Republican Party
24   does not sufficiently respond to Washington's assertion that this legal issue currently stands
     before the state court. *See State ex rel. Wash. State Public Disclosure Comm'n v. Wash. State
25   Republican Party*, King County Superior Court No. 08-2-34030-9.

26

ORDER, C05-0927-JCC
PAGE - 17

Therefore, Washington does not need to assert a compelling governmental interest in pursuing I-872. Its previously asserted interest "in providing voters with relevant information about the candidates on the ballot is easily sufficient to sustain I-872." *Wash. State Grange*, 552 U.S. at 458; *see also Anderson v. Celebrezze*, 460 U.S. 780, 796 (1983) ("There can be no question about the legitimacy of the State's interest in fostering informed and educated expressions of the popular will in a general election.").

**B.      Associational Burdens in Electing Precinct Committee Officers**

Although Washington's implementation of I-872 is constitutional with respect to partisan elected offices, Washington's current process for electing the major political parties' Precinct Committee Officers ("PCO") does not pass constitutional muster.[12]

All Washington voters receive the same primary ballot regardless of the presence or

_____

[12] Washington and the Grange contend that the Court should refrain from reaching the PCO-election issue because "Washington's law governing PCO elections is not part of I-872." (*See* Dkt. No. 239 at 20.) To the contrary, sufficient evidence demonstrates that Washington's implementation of I-872 affected PCO elections. *See* 08-15 Wash. Reg. 52 (July 11, 2008) ("These rules implement Initiative 872 (top two primary) for partisan public office, and implement the elections for precinct committee officers and president and vice-president in the context of Initiative 872."); (Dkt. No. 269-4 at 19 (Rule-Making Order explaining, "This change in primary election systems necessitates changes in the administrative rules relating to the format of ballots, and administration of political party precinct committee officer elections.").) Moreover, Washington and the Grange concede that because the new system no longer serves to determine the nominees of a political party, Washington necessarily eliminated the 10 percent threshold for election of precinct committee officers. (Dkt. No. 255 at 3); *see also* Wash. Rev. Code § 29A.80.051 ("[T]o be declared elected, a [PCO] candidate must receive at least ten percent of the number of votes cast for the candidate of the candidate's party receiving the greatest number of votes in the precinct."). I-872 undoubtedly had an impact on PCO elections. Additionally, requiring that the political parties file yet another complaint to reach the merits of this issue would serve no useful purpose, as Washington and the Grange have had ample notice of the allegation and opportunity to respond. *See In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 460 F.3d 1217, 1228, 1248 (9th Cir. 2006) ("We have often said that the public policy favoring disposition of cases on their merits strongly counsels against dismissal. . . . It is too late in the day and entirely contrary to the spirit of the Federal Rules of Civil Procedure for decisions on the merits to be avoided on the basis of such mere technicalities.").

1   absence of a voter's party affiliation, because "the primary does not serve to determine the

2   nominees of a political party but serves to winnow the number of candidates to a final list of

3   two for the general election." *See Wash. State Grange*, 552 U.S. at 453 (quotation marks

4   omitted). Nonetheless, PCOs are elected on the same ballot used in the top-two primary. The

5   parties agree that PCOs are officers of the major political parties, forming the grassroots level

6   of political-party organization. Although PCOs may perform limited public functions, they are

7   not public officials: "Precinct Committee officers organize their local precinct for their party

8   . . . ." (Dkt. No. 250 at 3.) Unlike candidates in the partisan primary who have the option of

9   listing a party *preference*, candidates seeking election as party PCOs must be members of the

10  political party. *See* Wash. Rev. Code § 29A.80.041. Importantly, voters in the partisan "party

11  preference" races are selecting individuals to serve as members of a government office; voters

12  in the PCO races, on the other hand, are selecting individuals to serve as members of the

13  political parties. This distinction is critical.

14      In *Eu v. San Francisco County Democratic Central Committee*, 489 U.S. 214, 230–31

15  (1989), the Supreme Court held that California's restrictions on how parties should be

16  organized and how they select their leaders unconstitutionally burdened political parties'

17  freedom of association. The Supreme Court recognized the strength of a party's interest in

18  selecting its own leaders and noted the important role party leaders play in shaping the party's

19  message. *Id.* at 230, 231 n.21. Applying *Eu* to Arizona's PCO-election scheme, the Ninth

20  Circuit held that "allowing nonmembers to vote for party precinct committeemen violates the

21  Libertarian Party's associational rights. Precinct committeemen are important party leaders

22  who[, like Washington PCOs,] choose replacement candidates for candidates who die or resign

23  before an election." *Ariz. Libertarian Party, Inc. v. Bayless*, 351 F.3d 1277, 1281 (9th Cir.

24  2003). Here, the political parties contend that because all Washington voters receive the same

25  primary ballot, which includes PCO elections, Washington similarly allows nonmembers to

26  vote for party PCOs.

ORDER, C05-0927-JCC
PAGE - 19

Without more, it seems that *Bayless* plainly holds that Washington's system for electing PCOs is unconstitutional. But it is not so simple. In *Bayless*, Arizona conducted a "semiclosed primary system" in which "voters who are unaffiliated, registered as independents, or registered as members of parties that are not on the primary ballot may vote in the party primary of their choice." *Id.* at 1280. Because Arizona law authorized independent voters and voters registered as affiliating with other political parties to vote for political-party PCOs, Arizona's system was unconstitutional. In Washington, however, PCO candidates appear in a separate location from the partisan "party preference" candidates. More importantly, Washington requires that the ballots state the following: "Precinct committee officer is a position in each major political party. For this office only: *If you consider yourself a democrat or republican, you may vote for a candidate of that party.*"[13] Wash. Admin. Code § 434-230-100(5)(c) (emphasis added). Accordingly, Washington and the Grange argue that because voters must consider themselves members of either party, Washington law, unlike Arizona law, does not authorize unaffiliated voters or members of third parties to participate in the election of a party's PCO; only voters who have affiliated with or are members of a particular party may vote in the PCO election of that party, and only that party.[14]

_____

[13] Although the administrative code uses lowercase typeface, the ballots use uppercase typeface for "Democrat" and "Republican." (*See* Dkt. Nos. 242 at 5, 243 at 4, 7.)

[14] In essence, with respect to the PCO elections, Washington has created a blend between an "open primary" and a "closed primary." In an open primary, "the voter can choose the ballot of either party but then is limited to the candidates on that party's ballot." *See Democratic Party of Wash. v. Reed*, 343 F.3d 1198, 1203 (9th Cir. 2003). Many states operate open primaries, but the Supreme Court has not ruled on whether open primaries comply with the Constitution. *See Jones*, 530 U.S. at 577 n.8 ("This case does not require us to determine the constitutionality of open primaries."). In a closed primary, "only voters who register as members of a party may vote in primaries to select that party's candidates." *See Reed*, 343 F.3d at 1203; *see also Jones*, 530 U.S. at 577 ("Under [a closed-primary] system, even when it is made quite easy for a voter to change his party affiliation the day of the primary, and thus, in some sense, to 'cross over,' at least he must formally *become a member of the party;* and once he does so, he is limited to voting for candidates of that party."). Here, of course, the voter must "consider" him or herself a Republican or a Democrat before so voting.

ORDER, C05-0927-JCC
PAGE - 20

The Court agrees with the political parties that the personal "consideration" of party association is insufficient to withstand constitutional scrutiny. In *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 212 (1986), the Republican Party of Connecticut, recognizing the demographic importance of independent voters, adopted an organizational rule that permitted independent (or unregistered) voters to participate in Republican Party primaries. Yet Connecticut enforced a law that required voters in a political primary to register as members of a particular party. *Id.* at 210–11. The Supreme Court held that Connecticut's law violated the Republican Party's right to freely associate in part because "the freedom to join together in furtherance of common political beliefs necessarily presupposes the freedom to identify the people who constitute the association." *Id.* at 214 (quotation marks omitted).

Here, Washington's PCO election similarly infringes on the political parties' freedom to identify the people who constitute their associations. *See Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000) ("[F]reedom of association plainly presupposes a freedom not to associate." (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984))). The Republican and Democratic parties are not satisfied that the voters' in-the-moment self-consideration of party association is sufficient to identify its true party members.[15] The system allows the electorate to participate in the selection of the political parties' officers even though the parties may not prefer to associate with voters who consider themselves members in a fleeting moment in a voting booth. At worst, a voter who has for years expressly affiliated with a rival party may attempt to sabotage the other parties' election by silently declaring for a fraction of a minute cross-party affiliation. The system allows non–party members to vote for officers of the political parties, and the First Amendment does not permit Washington to impose that type of membership

---

[15] It is merely a distinction without meaning that in *Tashjian* Connecticut attempted to limit the political parties' voter membership whereas Washington's system arguably expands party membership. The central holding is that the political parties, not the government, are free to define the scope of their membership.

1     when the parties have not so consented.

2         The political parties have suggested several alternative methods that would satisfy them

3 that particular voters are indeed members of their respective parties. For example, the political

4 parties have suggested that it would identify as members of its party voters who take a party oath.[16]

5 (Dkt. No. 250 at 7–8.) The current system does not facilitate an oath. (*See* Dkt. No. 245 at 12

6 (Information Washington provides its voters explains eligibility in PCO elections: "You do not

7 have to formally join the Democratic or Republican Party, you do not have to sign a party oath,

8 and voting in this election will not put your name on any party lists.").) The political parties

9 note that they would be satisfied of party membership if voters accepted a separate ballot with only

10 a specific party's candidates. (Dkt. No. 250 at 6.) The current system does not facilitate separate

11 ballots for PCO elections. The political parties further suggest that they might be satisfied of party

12 membership if a voter checked a box indicating affiliation with the particular party. (*Id.* at 9.)

13 Again, the current system does not facilitate a check box. Regardless of what would satisfy the

14 Republican and Democratic Parties, those parties have made it abundantly clear that they do not

15 accept as members of their respective parties voters who must ask, at the prompting of the ballot,

16 only whether they "consider" themselves party members. *See Democratic Party of Wash.*, 343 F.3d

17 at 1204 ("The Washington scheme denies party adherents the opportunity to nominate their party's

18 candidate free of the risk of being swamped by voters whose preference is for the other party. . . .

19 Even a single election in which the party nominee is selected by nonparty members could be

20 enough to destroy the party." (quotation marks omitted)); *see also Jones*, 530 U.S. at 574

21 ("Unsurprisingly, our cases vigorously affirm the special place the First Amendment reserves

22 for, and the special protection it accords, the process by which a political party selects a

23 standard bearer who best represents the party's ideologies and preferences." (punctuation

24 ———————————————————

25        [16]The Democratic Party agrees with the Republican Party's positions, having joined the
26 Republican Party's motion for partial summary judgment. (Dkt No. 247 at 1.)

1   omitted)). The system does not allow the political parties to identify their members in a manner

2   they so choose, and it therefore severely burdens the political parties' associational rights.

3      Because Washington's PCO elections severely burden the political parties'

4   associational rights, the Court may uphold the form of those elections only if Washington

5   shows that its election method is narrowly tailored to serve a compelling governmental interest.

6   *See Wash. State Grange*, 552 U.S. at 446. Washington has not provided any such justification

7   that would survive this high standard. *See id.* Accordingly, the Court grants in part the political

8   parties' partial motions for summary judgment.

9      Finally, the Court rejects the political parties' request that the Court enter an injunction

10   ordering that Washington implement its PCO elections in a particular manner. *See generally*

11   *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) ("A mandatory injunction goes

12   well beyond simply maintaining the status quo *pendente lite* and is particularly disfavored.

13   When a mandatory preliminary injunction is requested, the district court should deny such

14   relief unless the facts and law clearly favor the moving party." (punctuation and citations

15   omitted)). As noted earlier, the political parties offer multiple approaches that would satisfy

16   them that only party members select their PCOs. Washington may also decide to implement

17   PCO elections in a manner not yet conceived but ultimately satisfactory to the political parties.

18   Washington may even implement PCO elections in a way that severely burdens the political

19   parties' associational rights but does so in a manner narrowly tailored to serve a compelling

20   governmental interest. Or Washington may decide to stop conducting public elections of

21   PCOs. Given the wide range of options, the Court declines to order an injunction imposing a

22   particular form of election.

23   III.   CONCLUSION

24      Put simply, Washington's implementation of I-872 with respect to partisan offices is

25   constitutional because the ballot and accompanying information concisely and clearly explain

26   that a candidate's political-party preference does not imply that the candidate is nominated or

endorsed by the party or that the party approves of or associates with that candidate. These instructions—along with voters' ability to understand campaign issues and the fact that the voters themselves approved the new election system through the initiative process—eliminate the possibility of widespread voter confusion and with it the threat to the First Amendment. The reasonable, well-informed electorate understands that the primary does not determine the nominees of the political parties but instead serves to winnow the number of candidates to a final list of two for the general election.

On the other hand, Washington's method of electing precinct committee officers is unconstitutional because it severely burdens the political parties' ability to identify and associate with members of their respective parties. Precinct committee officers are grassroots representatives of the political parties, yet all voters, regardless of party affiliation, receive the same candidate ballot and have an opportunity to elect those officers. The political parties have a right to object to Washington's method of determining party affiliation for these officers, and Washington has not shown that its interests in using this system outweigh the First Amendment's special associational protections.

Accordingly, the Court GRANTS IN PART and DENIES IN PART Washington's and the Grange's motions for summary judgment (Dkt. Nos. 239, 249). The Court likewise GRANTS IN PART and DENIES IN PART the Democratic and Republican Parties' motions for partial summary judgment (Dkt. Nos. 247, 250). The Court STRIKES the trial date. The Court DENIES AS MOOT Washington's motion to strike certain witnesses (Dkt. No. 287).

DATED this 11th day of January 2011.

John C. Coughenour
UNITED STATES DISTRICT JUDGE

ORDER, C05-0927-JCC
PAGE - 24